UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBORAH S. JONES,<br>        Plaintiff,<br><br>        v.<br><br>Carolyn W. Colvin[1], as Acting Commissioner,<br>Social Security Administration,<br>        Defendant. | CIVIL ACTION<br>NO. 12-40061-TSH |

**ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (Docket No. 11) AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (Docket No. 13)**
**February 10, 2014**

**HILLMAN, D.J.**

**Nature of the Proceeding**

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying an application for Social Security disability benefits by Plaintiff, Deborah S. Jones ("Jones"). Jones has filed Plaintiff's Motion For Judgment On The Pleadings (Docket No. 11). Defendant, Carolyn W. Colvin, as Acting Commissioner, Social Security Administration has filed a cross-motion: Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket No. 13).

---

[1] Jones originally brought her Complaint against the then Commissioner of the Social Security Administration, Michael Astrue.  Pursuant to F.R.Civ.P. 25(d), Carolyn W. Colvin is substituted as the Defendant in this matter.

**Procedural History**

On August 5, 2010, Jones filed applications with the Social Security Administration ("SSA") for Social Security disability benefits and supplemental security income (*Tr.,* at 142-43, 146-152)[2], alleging she had been disabled since December 1, 2008. Jones alleged that she was limited in her ability to work due to osteoarthritis, asthma, high blood pressure, sleep apnea, depression, memory problems and acid reflux . (*Id.*, at 169). The claim was denied and Jones has exhausted her administrative remedies.

Jones seeks reversal of the Commissioner's decision on the grounds that the findings of the Administrative Law Judge ("ALJ") were not supported by the substantial evidence on the record because the ALJ erred by: (1) not assessing additional mental limitations to the residual functional capacity ("RFC"), and (2) not categorizing her sleep apnea as a severe impairment.   The Commissioner asserts that the ALJ's decision is supported by substantial evidence on the record and therefore, should be affirmed.

**Background**

1. *Summary of Educational and Occupational History*

Jones was born in 1962 and at the time of the hearing before the ALJ, was residing in Gardner, MA.   She attended school through the ninth grade and received her GED in or about 2004. (*Id.*, at 170, 258).   Jones's employment history includes work as a certified nursing assistant, personal care attendant, a factory laborer, cashier, counter-help and housekeeper. (*Id.*, at 36-43 ).   Jones stopped working in November 2008 and alleges she has been unable to work since December 1, 2008 .

---

[2]A transcript of the official record has been filed under seal with the court, (Docket No. 10)("*Tr.*")

2. *Medical History*

In June 2010, plaintiff saw Anthony Santilli, M.D., a pulmonary specialist, for a consultation. Jones reported that she had experienced shortness of breath her whole life which had worsened over the past several months.  She also complained of joint pain, lower back pain, morning stiffness, and psychiatric issues (*Id.*, at 233). She acknowledged smoking a pack of cigarettes a day for 35 years. Dr. Santilli encouraged her to quit smoking and recommended a course of action to achieve that result (*Id.,* at 233-234). Jones reported that she exercised frequently (*Id.,* at 234). Dr. Santilli noted he would likely start plaintiff on CPAP therapy for treatment of her sleep apnea and that he expected this treatment to be of great value to her (*Id.*).

In June 2010, also saw Dr. Kloman, a neurologist, because she had been experiencing headaches and impaired concentration, as well as past episodes of confusion (*Id.*, at 412).  Dr. Kloman noted that Jones was alert and able to fully and completely answer all questions, name and vocabulary were normal, and short and long-term memory were grossly normal (*Id.*, at 413-414). He characterized results of testing as normal (*Id.*, at 414). A cerebral CT scan at this time was also normal (*Id.*, at 311).  During the time that Jones saw Drs. Santilli and Kloman, she lived with her son and his partner, and she cared for his two children as well as her daughter's three-year-old child (*Id.*, at 412).

In July 2010, Dr. Krant saw Jones for a physical exam (*Id.*, at 252).  The exam revealed signs of bilateral knee discomfort with a positive patellar threat on both sides (*Id.*). Her lungs were clear, without rales or rhonchi (*Id.*). Joint exam showed symmetric articulations, without synovitis, warmth or erythema (*Id.*).  An examination of Jones's back showed normal cervical and lumbar lordosis, without percussion tenderness (*Id.*).  A neurologic exam showed normal muscle bulk and tone, reflexes 2+ and symmetric, and clear sensorium (*Id.*). Dr. Krant's

conclusion was that Jones was "asymptomatic hyperuricemia … with probable metabolic syndrome complicating advancing osteoarthritis" (*Id.*). He recommended aggressive efforts at weight reduction, with institution of low-dose pain medications for symptom relief (*Id.*). Dr. Krant noted that Jones was markedly obese and that she (Jones) recognized this as a modifiable risk factor for knee osteoarthritis (*Id.*). Jones underwent a methacholine challenge test in July 2010; the results were consistent with a clinical diagnosis of asthma (*Id.*, at 409). Polysomnography testing conducted contemporaneously showed severe obstructive sleep apnea that could be fully ameliorated with CPAP treatment (*Id.*, at 416).

In October 2010, Dr. Santilli reported that Jones had started smoking up to a pack a day again, due to stress in her personal life (*Id.*, at 405). She reported shortness of breath on exertion, but said her cough was pretty well controlled (*Id.*). She was using the CPAP and reported that she was using a new machine and doing quite well (*Id.*, at 406). She also reported that her breathing had improved somewhat since she started taking Lasix for lower extremity edema (*Id.,* at 405). Jones's vital signs were stable and her blood oxygen saturations was 95% on room air (*Id.*). After this visit, Jones underwent an Echocardiographic test, which showed normal systolic and left ventricular diastolic function, no wall motion abnormalities and possible mildly increased systolic pressure. (*Id.,* at 474).

In December 2010, Dr. Santilli noted that Jones mostly complained of psychiatric problems at this visit, saying her depression was getting worse (*Id.*, at 456). She also reported difficulty with dyspnea on exertion which may or may not have been related to fatigue (*Id.*). Her lower extremity edema was improved (*Id.*). The rest of her conditions were essentially unchanged (*Id.*). She complained of significant stressors and said she still smoked a pack of cigarettes a day

(*Id.*). The findings with respect to the physical exam were unremarkable; blood oxygen saturation was 99 % on room air (*Id.*).

From January 201-May 2011, Jones had a follow-up appointments at Berkshire Rheumatology. Her issues related to her ankle and knee pain and she ultimately underwent right knee arthroscopy. She was ultimately advised that she could perform activities and be weight-bearing as tolerated, but to avoid kneeling and squatting (*Id.,* at 499, 567-68, 594).

On April 28, 2011, plaintiff presented to the emergency room complaining of chest pain, and right knee pain since her arthroscopy (*Id.*, at 552). Chest x-rays showed no acute pulmonary disease, and right lower extremity doppler showed no sonographic evidence of acute deep venous thrombosis or major venous occlusion (*Id.*, at 557-558). Left and right shoulder x-rays done in May 2011 were unremarkable (*Id.*, at 550). A chest CT done in June 2011, showed her pulmonary nodules were stable (*Id.*, at 548). Echocardiographic testing after this visit showed normal systolic and left ventricular diastolic function, no wall motion abnormalities and possible mildly increased systolic pressure (*Id.,* at 606).

### 3. *Mental Health Issues*

In late September 2010, Elizabeth Young, MSW, LCSW, completed an Adult Comprehensive Assessment of Jones. (*Id.*, at 522-39). Jones was assessed a current GAF of 35.[3] (*Id.*, at 534).[4]

---

[3] "The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning and refers to the level of functioning at the time of evaluation. GAF scores can range from 0 to 100. [A] score in the range of 21 to 30 reflects a behavior 'considerably influenced by delusions or hallucinations' or "'serious impairment in communication or judgment' or 'inability to function in almost all areas' [the 'Psychotic Range']; 31 to 40 indicates '[s]ome impairment in reality testing or communication' or 'major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood;' 41 to 50 reflects '[s]erious symptoms' or 'any serious impairment in social, occupational, or school functioning' [the 'Multiple Range']; and 51 to 60 indicates '[m]oderate symptoms' or 'moderate difficulty in social, occupational, or school functioning' [the 'Moderate Range']." *Bernier v. Astrue,* CIV.A. 09-12167-DJC, 2011 WL 1832516 (D. Mass. May

In October 2010, plaintiff saw Margaret Stephenson, Ph.D., for a consultative psychiatric evaluation (*Id.*, at 258). Jones told Dr. Stephenson that she had been terminated from her last job due to inadequate performance and, on the job prior to that, she had been fired due to being accused of tampering with the register (*Id.*). She said she had a history of psychiatric hospitalization due to suicidal ideation, 4-5 years earlier (*Id.*). She also said she was awaiting assignment to a therapist for treatment (*Id.*). Jones acknowledged a history of crack abuse and described a legal history of being incarcerated for larceny multiple times, which she attributed to her substance abuse (*Id.*, at 259). She said she had not engaged in substance abuse since April 2004 (*Id.*). She reported vivid and disturbing memories of abuse when she was a child and also from a former domestic partner, which were recently triggered by a traumatic incident suffered by her grandson (*Id.*, at 260). She reported dysphoric mood, psychomotor retardation, crying spells, feelings of guilt, psychomotor agitation, irritability, and memory problems. She also reported panic symptoms (*Id.*). Dr. Stephenson noted that during the testing process, plaintiff was "impulsive and worked very quickly, but not carefully. She doodled when directions were given and was somewhat apathetic during the process" (*Id.*). Dr. Stephenson indicated that, "[o]n the Cognistat, cognitive status examination, she] was oriented to person, place, date, and time. She scored in the average range on the Language Comprehension, Repetition, and Naming subscales. She scored in the average range on the Calculations subscale, correctly responding to 4/4 simple calculations. She scored in the average range on the Reasoning, Similarities and Judgment subscales, passing the screen" (*Id.*).

---

13, 2011)(internal citation omitted)(citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–33 (4th ed., text rev. 2000)).

[4] Jones had started seeing Young for therapy sessions a little more than a year before the hearing; she saw Young for approximately six months. (*Tr.*, at 47). Thus, it appears that the GAF of 35 was assigned in conjunction with the information which Young received from Jones when preparing her initial assessment.

Jones "scored in the Low Average range on the Auditory Memory index, the Visual Memory index, the Visual Working Memory index, the Immediate Memory Index, and the Delayed Memory index. Although there were no significant discrepancies between index scores, she performed relatively better on the Auditory Memory index, the Visual Memory index, and the Intermediate Memory index with scores that fell in the Upper Low Average range. Her Visual Working Memory index score and Delayed Memory Index score fell in the Low Average range, and indicated moderate difficulty temporarily holding and manipulating spatial locations and visual details in memory. Her scores showed Low Average performance recalling orally and visually presented information immediately after presentation." (*Id.*, at 261).

Dr. Stephenson diagnosed Jones with depressive disorder not otherwise specified, post traumatic stress disorder ("PTSD"), and crack abuse in remission, with a GAF of 50. Dr. Stephenson stated: "[h]er Cognistat profile showed no impairments in orientation, attention, language, calculations, or reasoning. She is capable of understanding and following directions, maintaining attention and concentration, making appropriate decisions, and getting along with others (*Id.*). [Wechsler Memory scale-4 testing] results show Low Average range on all indexes, indicating Mild to Moderate impairment across indexes, with slightly better performance on Auditory, Visual, and Immediate Memory, relative to Visual Working Memory and Delayed Memory. (*Id.*). Bender-Gestalt testing showed low average performance on the recall phase, "suggesting mild difficulties with storing and retrieving information from memory." (*Id.*). The Trail-making Tests showed no impairments" (*Id.*).

A mental RFC assessment of Jones was completed by Dr. Kasdan on October 13, 2010. Jones was found to have moderately limited ability to understand and remember instructions, but was not otherwise significantly limited with respect to her understanding and memory. (*Id.*, at

267). As to her concentration and persistence, she was moderately limited as to her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods and her ability to complete a normal workday and workweek without interruption from psychologically based symptoms ad to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). She was otherwise not limited in this category. (*Id.*). As to social interaction, she was moderately limited in her ability to interact with the general public, but was otherwise not limited. Finally, as to adaption, she was moderately limited as to her ability to respond appropriately to changes in the work setting, but was otherwise not limited. (*Id.*).

Also in October 2010, plaintiff was seen by Dr. Buttar, a clinical psychiatrist for a psychiatric evaluation (*Id.*, at 518). Jones described worsened anxiety and panic since a grandson reported suffering a traumatic incident (*Id.*). She stated that she had not been sleeping well for 3 months, even with the CPAP machine, because she struggles with racing thoughts and worries.(*Id.*). She also reported memory problems (*Id.*). On mental status exam, plaintiff was casually groomed with animated face and fair eye contact, but showed distress and anxiety; her attitude was cooperative with appropriate behavior (*Id.*, at 520). She described her mood as sad, depressed, frustrated, irritable and angry (*Id.*). She denied hallucinations and paranoia in thought content; she had passive suicidal ideation but contracted for safety (*Id.*). Her thought processes seemed coherent and logical, with ruminative thoughts (*Id.*). She was optimistic and future-oriented (*Id.*). She showed fair insight and judgment (*Id.*). Cognitively, she was awake, alert and oriented (*Id.*). Dr. Buttar diagnosed a major depressive disorder and PTSD, and ruled out generalized anxiety disorder (*Id.*). He assessed plaintiff's GAF at 65 (*Id.*). Dr. Buttar started plaintiff on anti-depressants and noted she was participating in anxiety management therapy (*Id.*, at 520-521).

Notes from the Brien Center from August 2011, indicate that Jones was cognitively intact, and was feeling stable, more calm, less irritable, and more mellow, despite being out of Zoloft for about a week (*Id.,* at 606). She continued to complain about being overwhelmed having to take care of her two grandchildren. In September 2011, plaintiff was noted to be alert and fully oriented, with clear, coherent, and productive speech; she said she felt like her medicine was helping (*Id.*, at 605).

### 4. *Medical expert opinions*

Dr. Kasdan, a state agency consulting physician, reviewed the evidence in October 2010 and concluded that Jones had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence and pace. Dr. Kasdan concluded plaintiff was able to understand, remember, and carry out at the very least simple basic tasks; she appeared able to maintain adequate concentration/pace to simple tasks for 2 hour intervals in an 8 hour day; she retained the capacity to relate adequately with others; and she appeared able to adapt adequately to routine changes (*Id.,* at 266-269, 281). In November 2010, another state agency consulting physician, Dr. Poirier, reviewed the evidence and concluded that Jones retained the capacity to perform light work (albeit with limited standing and walking), and was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling, with a limited ability to push/pull with her lower extremities, with the need to avoid concentrated exposure to temperature extremes and hazards such as unprotected heights and dangerous moving machinery, and to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (*Id.*, at 419-426).

In February 2011, a state agency mental health consultant, Ginette Langer, Ph.D., reviewed the updated evidence and re-affirmed the previous mental residual functional capacity and

psychiatric review technique forms from Dr. Kasdan as written (*Id.,* at 545).   In March 2011, state agency consultant, Dr. Caraceni, reviewed the updated evidence and affirmed the previous physical residual functional capacity assessment from Dr. Poirier (*Id.,* at 546).

     5. *Claimant's Ability to Perform Everyday Activities; Claimant's Ability to Work*

With respect to her mental health, Jones testified that she suffers from flashbacks, has no sleeping pattern and therefore, will sometimes fall asleep "at the drop of a dime," has trouble concentrating and has a poor memory—she will forget she left something cooking on the stove, where she put her keys or to take her medicine (this type of thing happens, on average, 3-4 times per week). (*Id.*, at 47-48).   With respect to her physical health, Jones testified that she suffers from arthritis in both knees, chronic back and hip pain, asthma and respiratory issues (Jones smoked two packs of cigarettes a day for an extended period, but recently cut back to a pack every four days.) Jones also testified that she has sleep apnea and the "[CPAP] machine helps her get maybe a total of three hours sleep.   But then she [has] racing thoughts … [her doctors] haven't found anything yet that's working for [her] in an antidepressive that helps [her] to sleep." (*Id.*, at 49-50).   As a result, she's tired during the day and takes multiple naps (*Id.*, at 55-56).   She has decreased energy and most ot the time when she gets up in the morning she does not have want to go out and do things. (*Id.*, at 56).   Jones testified that she would not be able to be on time for work every day if she got a job, and would be absent at least one day a week—because she does not want to get out of bed. (*Id.*, at 57).   Jones attorney suggested that she is largely unable to concentrate and is subject to panic attacks. (*Id.,* at *54*).   Jones testified that she's not sure whether she could manage her activities of daily living and keep up with her prescriptions without help because of her "forgetfulness." (*Id.*, at 55).   She also testified that if she was to go pick up 4-5 items, she would have to be given a written list of those items.   (*Id.*, at 54).

A vocational expert ("VE"), James Parker, testified at the hearing. The VE was aware of Jones's past work experience, which ranged medium to heavy in exertion and semi-skilled to light and unskilled/semi-skilled. (*Id.,* at 59-60). The ALJ presented the VE with a hypothetical in which she asked the VE to assume the following facts:

- An individual similar to Jones in age, education and work experience
- An individual who can perform work at the light exertional level.
- The individual can occasionally use foot pedals and "standing, walking four hours, postural are all occasional, avoid concentrated exposure to extreme cold, extreme heat and hazards. And no exposure to respiratory irritants."
- As for mental limitations, the individual can "understand, remember and carry out instructions consistent with unskilled work. Will be able to maintain concentration, persistence and pace for two hours at a time during a normal work day."
- The individual has some difficulties in relationships on a personal level, [but] can retain the capacity to relate adequately to others. Can adapt to routine changes in the workplace setting."

(*Id.,* at 61). The VE testified that the individual would be able to perform Jones's past relevant work as an assembler of small products. However, the "maid" and counter attendant positions would require more than four hours of standing and walking in an eight hour day. He also eliminated the cashier position. (*Id.*, at 61-62). The ALJ then suggested the following second hypothetical to the VE, assuming the same limitations as hypothetical number one except that:

- The individual can understand, remember and carry out instructions consistent with "SVP three and four level work."

The VE testified that in addition to small products assembler, the individual could also perform Jones's past work as a cashier. (*Id.*, at 62).

The ALJ then asked the VE to consider an individual with miss work one day a week. The VE testified that if the individual were to be absent from work more than once a month on a sustained basis, the individual would be terminated from work and therefore, being absent four days a month would lead to termination from any job. (*Id.*, at 63). The VE testified that even if it were

11

determined that Jones's past work did not include small parts assembler, that occupation would satisfy both hypothetical 1 and 2, and there would be approximately 600 such positions available in western Massachusetts and nationally, approximately 750,000. The VE further testified that approximately 400 cashier positions would be available in the local economy and 800,000 would be available nationally. (*Id.*, at 64). Also fitting the hypothetical 1 and 2 would be a visual inspector on an assembly line, which has approximately 200 positions available locally and 180,000 available nationally. Fitting hypothetical 1 would be a laundry sorting position of which there are regionally approximately 325 positions and nationally, approximately 360,000. Fitting hypothetical 2, would be inventory positions, of which approximately 300 are available in the local economy and 400,000 nationally and recreation attendant, of which approximately 200 are available locally and 240,000 nationally. (*Id.*, at 64-65).

Jones's attorney asked the VE to consider whether any jobs would be available for an individual who is regularly late to work one or two days a week. The VE testified that such an individual would be terminated from any job. (*Id* ., at 65-66).

6. *The ALJ's Findings*

The ALJ determined that Jones had not been under a disability within the meaning of the Act from December 1, 2008 through November 15, 2011 (date that ALJ's decision issued). Specifically, the ALJ made the following findings:

1) Jones had not engaged in substantial gainful activity since December 1, 2008. (*Id.,* at 13).

2) Jones had the following severe impairments: knee pain, obesity, depression, and anxiety. (*Id.*) The ALJ determined that her obesity was severe because it can cause limitation of function. The ALJ further found that Jones's asthma, gastroesophageal reflux disease and sleep apnea were not severe impairments because they had not been shown to significantly limit her ability to perform basic work activities. (*Id.*, at 14).

3)   Jones did not have an impairment or combination of impairments that meets or medically equaled the severity of one of the listed impairments set forth in the applicable sections of the Code of Federal Regulations. (*Id.)* More specifically, the ALJ found that Jones's mental impairment did not satisfy the "paragraph B" criteria in that her conditions does not result in at least two of the following: (a) marked restriction of activities of daily living (the ALJ found she has mild restrictions), (b) marked difficulties in maintaining social function(the ALJ found she has moderate difficulties); (c) marked difficulties in maintaining concentration, persistence, or pace (the ALJ found she has moderate difficulties); or (d) repeated episodes of decompensation, each of extended duration *i.e.,* three episodes within 1 year or an average of once every four months, each lasting for at least two weeks (the ALJ found that she has not experienced any episodes of decompensation for an extended duration).   (*Id.*)    The ALJ also found that the evidence failed to establish that Jones satisfies the "paragraph C" criteria. (*Id.*)

4) After considering the entire record, including the effect of Jones's obesity, the ALJ found that she has the residual functional capacity ("RFC") to perform light work, except that she can only occasionally use foot pedals.   She can stand and walk, each 4 hours in an 8 hour day.   She is limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. She must avoid concentrated exposure to temperature extremes, respiratory irritants, and hazards such as unprotected heights and dangerous moving machinery. She can understand, remember and carry out instructions, maintain concentration, persistence and pace for 2 hours at a time during normal work hours, retains the capacity to relate adequately to others and can adapt to routine changes in the workplace setting.   (*Id., at 14-15*).

In making her findings, the ALJ determined that there was a lack of objective support for the conclusions reached by one or more physicians and questions concerning Jones's credibility. (*Id.*, at 15).   As to Jones's credibility, the ALJ found that there were a number of inconsistencies in her testimony compared to the evidence in the record—the nature of the inconsistencies "raises the specter of exaggeration of symptoms and the matter of secondary gain," which the ALJ stated could not be ignored. (*Id.*).   As to the objective evidence, the ALJ concluded that it "falls short of demonstrating the existence of pain and limitations of such severity as to preclude the claimant from performing any work on a regular and continuing basis." (*Id.*).

The ALJ summarized the findings of the various medical professionals who had treated/assessed Jones. (*Id., at 17-21*) The ALJ noted that Jones had seen a psychologist, Dr. Stephenson, for a consultative psychiatric evaluation in October 2010.   Dr. Stephenson diagnosed Jones with depressive disorder not otherwise specified, PTSD (post traumatic stress disorder), and crack abuse in remission.   She assigned Jones a GAF of 50 and stated that "[Jones's] Cognistat profile showed no impairments in orientation, attention, language, calculations, or reasoning.   She is capable of understanding and following directions, maintaining attention and concentration, making appropriate decisions, and getting along with others.". (*Id.*, at 18).

A second psychiatric assessment was done in September 2010.   At that time, Jones reported severe symptoms of anxiety and depression, PTSD symptoms related to past abuse, fatigue, insomnia, suicidal ideation, rapid heart rate, body tics and tearfulness. Jones was

seeking medication. (*Id,* at 19). During this period, Jones lived with her son and his wife and did cooking, cleaning and taking care of two kids; she reported being overwhelmed at times. She had also started to take college courses and was okay with getting out of the house. Jones was diagnosed with PTSD, major depressive disorder single episode, severe and cocaine dependence in sustained full remission. She was assigned a GAF of 35 and therapy and medication evaluation were recommended. The ALJ discounted this assessment because the assignment of a GAF of 35 "is not corroborated by the minimal symptoms the claimant reported. To support a GAF of 35, one would be suffering severely and would likely require institutional care," which was not the case. (*Id.*).

With respect to Jones's sleep apnea, the ALJ noted that at the hearing, Jones testified that she slept only three hours a night with her CPAP machine. The ALJ found this testimony to be inconsistent with the medical records which consistently described her sleep apnea as stable. (*Id,* at 23) . The ALJ also explained that a GAF of 50, while indicative of serious symptoms, does not preclude a finding that the claimant is able to engage in some type of unskilled work. Considering the GAF scores assigned to Jones, observations of Jones by interviewers and her treatment history, the ALJ determined that Jones "is functioning at a sufficient level to support a residual functional capacity that includes minimal mental limitations." (*Id.*, at 24).

5) Jones was able to perform past relevant work, that is, she could perform two of her past jobs, assembler of small products and cashier. (*Id.,* at 25). The ALJ went on to consider whether a successful adjustment to other work could be made should these jobs be determined not to be past relevant work. (*Id.*).

6) Given Jones's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Jones could perform. (*Id.*).

7) Jones has not been under a disability, as defined in the Act, at any time from December 8, 2008 (the alleged onset date) through November 15, 2011 (the date of the ALJ's decision). (*Id.*, at 26).

## Discussion

1. *Standard for Entitlement to Disability Insurance Benefits*

To qualify for disability insurance benefits, a claimant must demonstrate that s/he is disabled within the meaning of the Act. The term "disability" as the defined in the Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A). The impairment(s) must be severe enough to prevent the claimant from performing not only his or her

past work, but also any substantial gainful work existing in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R 404.1560(c)(1). In making such determination, the ALJ must assess the claimant's RFC in combination with the "vocational factors, [including the claimant's] age, education, and work experience". 20 CFR § 404.1560(c)(1).

To determine disability, the ALJ evaluates the claimant's application utilizing the following five-step analysis:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; [and] 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey v, Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001). It is the applicant's burden to show at Step 4 that s/he is not able to do past relevant work as the result of a "significant limitation;" if the claimant meets his/her burden, "the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." *Id.*; *see also* 42 U.S.C. 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). It should also be noted that "[a]ll five steps are not applied to every applicant, as the determination may be concluded at any step along the process". *Seavey*, 276 F.3d at 5.

### 2. *Court's Review Of Commissioner's Decision*

Pursuant to the Act, this Court may affirm, modify or reverse the Commissioner's final decision, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). This Court

15

reviews the Commissioner's final decision to determine whether: (i) the correct legal standard was applied, and (ii) the decision was supported by substantial evidence. *Id.,* at 9; *see also* 42 U.S.C. §405(g).  While the Court's review of questions of law is *de novo,* the Court defers to the Commissioner's findings of fact, so long as they are supported by substantial evidence.  *Seavey*, 276 F.3d at 9, 10. Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v.* Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *see also Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991)(even if administrative record could support multiple conclusions court must uphold Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")

In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the Court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence. *Ortiz,* 955 F.2d at 769. Ultimately, the Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the cause for a rehearing, 42 U.S.C §405(g)[5], but reversal is warranted only if the ALJ committed a legal or factual error in evaluating a claim or if the record contains no "evidence rationally adequate.... to justify the conclusion." *Roman-Roman v. Commissioner of Social Security*, 114. Fed. App'x. 410, (1st  Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health and Human Services*, 76 F. 3d. 15 (1st Cir. 1996).

---

[5]  Section 405(g) provides that "[t]he [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."

### 3. *Whether the Commissioner's Decision Should be Affirmed*

The ALJ undertook to apply the required five step sequential analysis. At Step 3, the ALJ determined that neither Jones's physical or mental impairments met or medically equaled a "listed" impairment. At step 4, the ALJ determined that based on her RFC, Jones could perform her past relevant work, specifically, small parts assembler and cashier. At the same time, the ALJ found that even if it were determined that small parts assembler and cashier were not properly deemed past relevant work (and therefore, going on to step 5), given Jones's age, education, work experience and RFC, she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.

Jones makes the following arguments in support of her motion: (1) the ALJ erred by not assessing additional mental limitations to the RFC (due to Jone's depression and anxiety) and in doing so, dismissed a large body of evidence, including opinions of treating physicians, which would support a finding that Jones suffers from substantial mental health impairments; and (2) the ALJ erred by not categorizing sleep apnea as a severe impairment.

The Commissioner, on the other hand, argues that the ALJ's decision should be affirmed because: the ALJ properly determination that Jones retained the RFC to perform past relevant work is supported by the administrative record, including the opinions of reviewing medical experts. The Commissioner further argues that the ALJ considered the functional impact of Jones's sleep apnea on her RFC when analyzing steps 4 and 5 of the sequential analysis and, therefore, it is irrelevant as to whether the ALJ erred by not finding her sleep apnea to be a severe impairment at step 2 of the sequential analysis.

***Whether the ALJ erred by not assessing additional mental limitations to Jones's RFC***

It is true, as Jones contends, that "[w]ith few exceptions ... an ALJ, as a lay person, is not qualified to interpret raw data in a medical record". *Manso-Pizarro*, 76 F.3d at 17.   At the same time, "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." *Id.*   Additionally, the ALJ has the discretionary power to discount medical opinions that are inconsistent with the majority of medical evidence in the record. *Keating v. Sec'y of Health and Human Servs.,* 848 F.2d 271, 276 (1st Cir. 1988); *see also*, *Haidas v. Astrue*, 2010 WL 1408618 (D.Mass. Mar. 31, 2010)(citing *Morales v. Comm'r of Soc. Sec.*, 2 Fed. App'x 34, 36 (1st Cir. 2001)).

Jones primary argument is that the ALJ did not give controlling weight to the treating source's opinion and dismissed the treating source's assignment of a GAF of 35 on the grounds that this score was not corroborated by the minimal symptoms reported by Jones.   Little time need be spent on this issue as the overwhelming evidence in the record supports the ALJ's finding.   The treating source in this case was Ms. Young, a licensed social worker and/or nurse.   Ms. Young assigned a GAF of 35 to Jones *at her initial evaluation*.   However, as noted by the ALJ, a GAF of 35 would suggest someone suffering from far greater mental impairments than that reflected by the record evidence as a whole. *See* note 2 *supra*, and the summary of Jones's mental health history, *supra* at pp. 6-9.   Furthermore, Jones was seen by Drs. Stephenson and Buttar during this same time frame; they assessed her GAF scores of 50 and 65, respectively.   Under the circumstances, the ALJ did not err by failing to give controlling weight to Ms. Young's assessment/opinions.

**Whether the ALJ erred by not categorizing sleep apnea as a severe impairment**

Jones next argues that given Jones's testimony, the ALJ erred by failing to categorize her sleep apnea as a severe impairment. The Commissioner argues that because the ALJ considered Jones's sleep apnea when performing her analysis of stages 3-5 of the sequential analysis, it is irrelevant whether she properly characterized the ailment as a severe impairment. In the alternative, the Commissioner argues that the substantial evidence in the record supports a finding that Jones's sleep apnea was not a severe impairment.

Any error at step two of the sequential analysis is harmless where the evaluation proceeds past step two and the administrative law judge considers all of the claimant's impairments at step four. *See Noel v. Astrue*, C.A. No. 11-cv-30037-MAP, 2012 WL 2862141 (D.Mass. Jul 10, 2012) ("Even if the ALJ did err in his finding that Plaintiff's anxiety was not a severe impairment, that error was harmless. Because the ALJ found that Plaintiff had at least one severe impairment, the ALJ took into consideration all of Plaintiff's impairments, both severe and non-severe, when assessing his RFC"); 20 C.F.R. § 404.1545(a)(2).

The ALJ acknowledged Jones's sleep apnea issues when assessing her RFC. However, the ALJ found Jones's testimony that she sleeps only three hours a night as the result of her sleep apnea (while using the CPAP machine) to be inconsistent with the objective medical evidence which established that her sleep apnea was being controlled through use of the CPAP machine. In particular, the ALJ cited to the reports of her treating physician Dr. Santilli, who described her sleep apnea as stable. Under the circumstances, I cannot find that the ALJ *considered* Jones's sleep apnea when assessing her RFC. Therefore, I will examine whether the ALJ erred by finding that Jones's sleep apnea was not a severe impairment.

The ALJ's finding that Jones's sleep apnea was not a severe impairment is supported by substantial evidence. While Plaintiff testified that she does not sleep more than three hours a night, even while using the CPAP machine, her treating physicians indicate that her sleep apnea is under control. Specifically, in July 2010, Jones underwent polysomnography testing which showed severed obstructive sleep apnea which could be fully ameliorated with CPAP treatment. (*Tr.*, at p. 416). In October 2010, in regards to Jones's sleep apnea, Dr. Santilli notes that she was doing quite well on the CPAP machine and in December 2010, he noted no changes in her condition. (*Tr.,* at pp. 406, 456). In October 2010, she did report to Dr. Buttar that she recently had not been sleeping well (since finding out about the incident with her grandson), even when using her CPAP, because she struggles with racing thoughts. (*Id.*, at 518). There is nothing in Dr. Buttar's report which attributes her recent sleeping problems to her sleep apnea. Accordingly, the ALJ did not err in finding that plaintiff did not have a "severe" impairment in the form of sleep apnea.

## Conclusion

For the foregoing reasons,

Plaintiff's Motion For Judgment On the Pleadings (Docket No. 11) is ***denied*** and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Docket No. 13) is ***allowed***.

/s/ Timothy S. Hillman
TIMOTHY S. HILLMAN
DISTRICT JUDGE